UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Ellen S. Coveney,                    :    Case No. 1:07-cv-706
                                     :
     Plaintiff,                      :
                                     :
vs.                                  :
                                     :
U.S. Bank National Association,      :
                                     :
     Defendant.                      :

**ORDER**

Before the Court in this age discrimination and retaliation case is Defendant's motion for summary judgment. (Doc. 23) Plaintiff opposes the motion (Doc. 36), and Defendant has replied. (Doc. 38) Plaintiff has also moved to strike the Defendant's reply under Fed. R. Civ. P. 56(c), or for leave to file a surreply. (Doc. 41) That motion is also fully briefed.

**FACTUAL BACKGROUND**

Ellen Coveney began work for Star Bank, now U.S. Bank, in November 1998. She was hired as an Operations Manager in the Bank's Retail Lockbox Department ("RTL"), which provides account payment processing services for the Bank's customers. The work of the RTL Department is time-sensitive, and several witnesses described the department as a hectic and pressured operations center. Coveney was 52 when she was hired. Her 2001 through 2003 written performance evaluations reflect "effective" to "highly effective" ratings by her supervisors. (Coveney

-1-

Deposition Exhibits 8 - 10.)   The Bank admits that it did not provide Coveney with written evaluations from 2004 through the summer of 2006.

Frequent turnover in RTL management resulted in Coveney reporting to several different supervisors prior to August 2005, when Andrew Alvey was hired as manager of the Bank's retail and wholesale lockbox operations.  Alvey was in his late 30's when he was hired.  RTL had four shift managers who reported to Alvey; by the end of 2005 those shift managers were Coveney (first shift), Ken Wolfe (second), Monica (Sterling) Kirk (third), and Angie Clemons (weekend).  Coveney testified that she found Alvey to be unprofessional, because he had a "short fuse" and frequently used curse words in the workplace.  She said that Alvey yelled at her on numerous occasions, and that he called a vendor's employees "f-ing idiots" in the presence of those employees.  (Coveney Deposition pp. 38-41)

At some point in December 2005, Alvey spoke to Coveney about a conversation Coveney had with Ken Wolfe.  Alvey did not hear this conversation, but it was reported to him by another employee, who apparently told Alvey that Coveney had argued with Wolfe.  Alvey cautioned Coveney that disagreements among supervisors must be handled professionally and off the work floor if necessary.  Coveney denied that she had inappropriately discussed the situation with Wolfe, and told Alvey that their

-2-

relationship was fine.

Alvey received another report in April 2006 about Coveney's inappropriate behavior. An employee reported to him that Coveney had made disparaging remarks about RTL's third shift staff and supervisor, and their inability to handle a particular customer's account. Alvey cautioned Coveney not to disparage other employees. (Coveney believes that Alvey received this complaint from third shift supervisor Monica Kirk, whom Coveney said was capable of "making something up like this to make [me] look bad.") (Coveney Deposition, p. 53.)

On July 28, 2006, Alvey met with an employee on Coveney's shift (Hess), at Coveney's request, to discuss vacation schedules. Hess had apparently transferred from a department that was not required to work holidays (unlike RTL), and he was unwilling to sign up for mandatory holiday work. One of Alvey's memoranda states that Alvey asked Hess why he could not resolve this scheduling issue directly with Coveney. Hess told him that Coveney had a very demeaning tone, and that she had embarrassed him by publicly discussing an error he made, rather than speaking to him in private. (See Alvey Exhibit 47)

Andrew Lyall was hired to replace Alvey as the RTL manager starting in late July 2006; Alvey remained with the Bank as Lyall's supervisor. Lyall was 30 years old when he began his job with the Bank. Alvey testified that as part of the transition

-3-

process, he wrote an evaluation on each of his shift managers; Coveney's evaluation is dated August 7, 2006. (Coveney Exhibit 13) Alvey also believed it was important to document his prior interactions with and concerns about Coveney's conduct before Lyall took over as her direct manager. Therefore, Alvey wrote a memo to Coveney entitled "Professionalism in the Workplace" also dated August 7. Alvey intended this memo to be an "Action Plan" for improvement in Coveney's conduct towards other employees. (Alvey Exhibit 47) Alvey believed that the "Action Plan" was an appropriate vehicle to achieve this goal and to help Coveney improve.

Alvey consulted with Dan Nocella, a member of the Bank's Human Resources Department assigned to the RTL location, before he gave the "Action Plan" to Coveney. Nocella began working for the Bank in April 2005. Nocella told Alvey that his action plan was not appropriate for the situation, and he recommended that Alvey give Coveney a formal "business conduct warning." Alvey described a conduct warning as a document that, unlike an action plan, would stay in an employee's file for the duration of their employment. (Alvey Deposition pp. 58-61) As a result of Nocella's input, Alvey did not give his "Action Plan" to Coveney. Instead, he wrote a "Business Conduct Warning." (Coveney Exhibit 14) This written warning recites the incidents described above, as well as an August 10, 2006 incident that was witnessed by

-4-

Andrew Lyall.  An employee came to Coveney with a question about the procedure for processing a check stub.  Lyall reported to Alvey that Coveney responded abruptly, "that's the way it's always been done," and did not offer the employee any constructive help.  After reviewing these incidents, Alvey's warning states "As a result of these issues, a pattern has developed of unprofessional behavior when interacting with others.  This has resulted in you lacking the respect and trustworthiness as a leader in the organization, thus making it very difficult for the department to succeed."  Alvey warned Coveney that, among other expectations, she must treat employees "with dignity and respect" and "be a model of professionalism." Coveney's "failure to show clear and dramatic improvement in any of the areas noted may result in additional disciplinary action, up to and including termination without additional warning periods."  Alvey also stated his belief that Coveney had the "ability to turn this situation around if you chose to do so."

Alvey, Lyall and Coveney met on August 11, 2006 to discuss the conduct warning.  Coveney admitted that Alvey had spoken with her on some of the occasions recited in that memorandum, but denied that she had been unprofessional with any employee. Regarding the August 10 incident, she believed that Lyall had injected himself into her conversation with her employee, and that he had misinterpreted her conduct.  She also told Alvey and

-5-

Lyall that the employee in question had her own "issues."

Alvey sent Coveney the draft of the transition evaluation on
August 14, in preparation for an August 16 review session.  But
before that meeting, Coveney wrote a memorandum to several Bank
management staff concerning "Management Harassment."  (Coveney
Exhibit 15)  She states there that she is concerned about the
business conduct warning, and wants to "go on record with my
continued concerns" about Alvey's conduct and inappropriate
behavior.  Coveney recites several incidents of Alvey's use of
curse words, which made her feel extremely uncomfortable.  She
states that on one occasion, Dan Nocella was present and heard
Alvey's language, leading her to believe the situation would be
addressed.  Coveney believes that Alvey's behavior was creating a
"hostile work environment."  She alleges that Alvey simply
refused to believe Coveney's side of the story about some of the
incidents recited in the warning.  She also claims that she told
Alvey that three employees were falsifying their time cards, but
that Alvey had not taken action.  She notes that she had not
received any monthly written reports on her performance during
2006, and assumed she was performing well until the August 11
meeting.

Finally, she notes her concern that

> ... there is some age discrimination by the
> people [Alvey] is hiring and promoting.  I
> think putting me on warning to terminate my
> position is intended for him to further his

> focus on 'younger staffing.' It is very
> disheartening when I hear one of his recent
> promotions, Stephanie Clemons, addressing him
> as 'Babe and Buddy.' It seems very
> inappropriate for him to be addressed in this
> manner since he is in an executive position.

(Coveney Exhibit 15) Coveney admits that this memorandum is the
first time that she complained to anyone in management about
Alvey's behavior or about discrimination.

Coveney received an e-mail from one of the recipients of her
August 16 memorandum, Mr. Chenevich, telling her the matter would
be investigated. Another of the recipients, Roberta Sims, is a
senior HR representative at the RTL location. Sims investigated
Coveney's complaints, and verified Alvey's use of coarse language
from reports of several other employees. Alvey was counseled
about this issue by his own supervisor. Alvey also admitted that
he had not completed monthly performance reviews (which the Bank
calls "one-on-ones") due to time pressures, and stated he would
start to do so. But Alvey denied that Coveney told him about
falsification of time records, and he told Sims that such an
issue would have been Coveney's responsibility to investigate.
He also told Sims that all of the hires and promotions with which
he had been involved were based on selection of best qualified
applicants, after interviews with upper management and HR
personnel. (See Nocella Exhibit 32, Memorandum from Sims to
Crotty dated 08/31/06, summarizing Sims' investigation.) Coveney
admitted that after she complained, she did not hear Alvey use

-7-

foul or coarse language again.

On August 16, Coveney met with Alvey to discuss Alvey's 08/07 "RTL Turnover Evaluation." (Coveney Exhibit 13) Alvey notes there that Coveney

> • Consistently displays a defeatist attitude in day to day operations impacting her direct reports.
>
> • Various situations through out the year that have shown [Coveney] to be unprofessional in the work place.
>
> • [Coveney] does not have the respect and trustworthiness [sic] of her associates or peers.
>
> ...
>
> • [Coveney] often looks to blame individuals vs. finding resolution to issues.

On the positive side, Alvey noted that

> • [Coveney] has a strong work ethic and will ensure that necessary data is inputted for productivity numbers and payroll are submitted timely and correct.
>
> • [Coveney] has a strong understanding of our customer base and what there needs are [sic].
>
> • Ellen has participated on external conference calls representing the site in a favorable manner.

Following these events, Coveney wrote a series of notes to herself about her meeting with Alvey and subsequent events. (Coveney testified that she prepared all of her notes at or close to the time of the events recounted.) One note about the August

-8-

16 review meeting states that Alvey told her that the 08/11 written warning "would go away and everything would be golden in 90 days." (Coveney Exhibit 23)  Coveney's much more detailed set of notes (Coveney Exhibit 24) recounts that Alvey admitted to her that he used profanity, and said he wanted Coveney to speak with Dan Nocella about her discomfort with Alvey.  Coveney talked to Nocella, who (according to Coveney's notes) appeared "very nervous and tried to make it look like I brought Andy's action to the surface because I had gotten written up."  Coveney told Nocella she was not comfortable discussing Alvey with him, and asked to talk with Roberta Sims instead, which she did on August 17. (Coveney Exhibit 24)

Sims could not recall the specifics of her conversations with Coveney, but Coveney's notes indicate that they discussed Coveney's concerns that Alvey was hiring exclusively younger people, particularly one who had made numerous errors in her prior position.  Coveney was also concerned that her warning had no end date, and that she "could hiccup and be fired."  She told Sims that she had to seek legal counsel in order to protect herself.

Lyall met with Coveney on September 6 to discuss Lyall's initial "RTL Transition" written evaluation of Coveney. (Coveney Exhibit 19) In this evaluation, Lyall listed several incidents he believed were inappropriate, including a day that Coveney left

-9-

early without checking that all her shift transmissions had been sent; not answering some questions Lyall had asked her about workloads; her failure to have two employees finish certain tests when Lyall had asked; and not timely providing correct data to another bank employee who had requested it.  Coveney's notes of this meeting state that Lyall "turned very nasty" when Coveney disputed some of these incidents.  (Coveney Exhibit 23)  She states that she was "constantly getting mixed signals" from Lyall and other managers about how to handle various situations with employees.

Coveney met with Sims the next day to talk about Lyall's evaluation.  (Coveney Exhibit 24 at p. 0061-62) Coveney disputed Lyall's comments about her leaving early and her employees' tests, and explained the error with the data sent to another employee.  Coveney told Sims that Lyall was treating her differently from Monica Kirk and Angie Clemons, the younger shift managers, and was showing favoritism to them.

On September 15, Sims met again with Coveney and Alvey to complete her investigation of Coveney's August 16 complaint. Coveney sent an email to Sims confirming the subjects they discussed, including Alvey's agreement not to use foul language, Coveney's feelings of being picked on because of her age, and being treated differently than other supervisors for alleged unprofessional conduct.  (Coveney Exhibit 20)

After mid-September, Alvey and Lyall testified that Coveney's performance improved, and that she appeared to be trying to avoid further instances of the conduct which led to her August warning. Coveney's notes state that on October 12, 2006, Lyall told her she was "doing a good job." (Coveney Exhibit 23) The record does not contain any evaluation reports to contradict this statement.

However, an incident on February 12, 2007 led to Coveney's termination. On that day, Susan Ridley (an employee on Coveney's shift) went to Coveney to talk about a problem with a customer's account. According to Ridley, Coveney cut her off in a harsh tone of voice, telling her "You've got bigger problems" than the customer in question. Coveney then spoke to Ridley about another error involving a different, larger customer, an error that Ridley had made before and that Coveney had counseled her not to repeat. The conversation lasted about five minutes, and Ridley said that Coveney did not yell at her or berate her in front of others. However, Ridley said that Coveney's tone of voice and her expressions made her feel chastised like a child, and very uncomfortable. (Ridley Deposition p. 23) Ridley became quite upset, walked away from Coveney, and went to a different part of the floor to try to work, but found she was too emotional to do so.

Ken Wolfe was at work that day, and his desk was adjacent to

Coveney's.  He testified that he witnessed the two women talking, and was concerned about the rising tension he perceived.  He walked to Coveney's desk, to intervene and try to calm the situation.  He confirmed Ridley's statement that there was no loud confrontation, but he testified that Ridley was clearly upset, and was "steamy" afterwards.

Ridley encountered Mary Ann Boots (another employee) whom Ridley felt she could trust, and said she needed to talk to her. When the two women got to a conference room, Ridley said she burst into tears.  Boots urged her to talk to Lyall about what happened.  Lyall arrived a few minutes later, and Ridley told him about the incident.  After taking some time away from the work area, Ridley returned to work and finished her shift.

Coveney testified that, shortly after the incident, Andy Lyall told her that Ridley had been quite upset, and asked Coveney to speak to her the next day and "try to clear the air." (Coveney Deposition p. 129)  Ridley was off the next two days, and when she returned the workload was heavy.  Coveney told Lyall she had not been able to speak to Ridley as a result.  According to Coveney, Lyall told her not to worry, "we'll just consider it an isolated incident...".  (Id. p. 130)

However, Lyall informed Alvey about the incident, and Alvey told Dan Nocella.  Lyall told Alvey that Ridley was quite upset at Coveney, and was close to quitting.  Alvey and Nocella

-12-

considered Ridley a valuable employee, and Nocella began to
investigate the incident, speaking individually with Ridley,
Boots and Wolfe.  He then asked Roberta Sims to meet with him and
Coveney.  Coveney denied that she had been inappropriate or
unprofessional with Ridley, and denied that Ridley had been upset
during their conversation.  Coveney described the encounter as
simply a "quiet conversation" about a significant mistake Ridley
made.  (Nocella Deposition p. 144) Lyall recommended that Coveney
be fired, and Nocella joined in that recommendation.  After
talking with in-house counsel and clearing the decision with
Alvey's supervisor, Nocella and Lyall met with Coveney on
February 27, 2007 to terminate her employment.  Coveney responded
that she could not understand why she was the one being fired
when it was Ridley who made a mistake concerning an important
customer.  Nocella testified that the decision to terminate
Coveney was based upon the Ridley incident, and Coveney's August
2006 written warning.  He concluded that Coveney's continued lack
of professional conduct to subordinates, despite the written
warning, justified her termination.  (Nocella Deposition pp. 44-
46)  Coveney was replaced by a 32-year old woman.

Coveney timely filed a charge of age discrimination and
retaliation with the EEOC.  She then filed her complaint in this
case, alleging claims for age discrimination and retaliation
under federal and state law, and for violation of Ohio public

-13-

policy.  Defendant seeks judgment on all of Coveney's claims.

**DISCUSSION**

1.  <u>Summary Judgment Standards</u>.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (quoting <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253 (1968)).  The Court is not duty bound to search the entire record in an effort to establish a lack of material facts.  <u>Guarino v. Brookfield Township Trs.</u>, 980 F.2d 399, 404 (6th Cir. 1992); <u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989), <u>cert. den.</u>, <u>Superior Roll Forming Co. v. InterRoyal Corp.</u>, 494 U.S. 1091 (1990).  Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. <u>Anderson</u>, 477 U.S. at 250.  The non-moving party "must do more

-14-

than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Electric Industries Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. <u>United States v. Diebold Inc.</u>, 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  <u>Id</u>. at 250.  "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir. 1979), <u>cert. dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'"

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations
omitted).

2.  Age Discrimination.

    Under the ADEA, an employer is prohibited from discharging
older employees based on their age. 29 U.S.C. § 623(a).  Coveney
may establish an ADEA claim by offering either direct or
circumstantial evidence of age discrimination.  See Kline v.
Tenn. Valley Authority, 128 F.3d 337, 348 (6th Cir. 1997).
Direct evidence is "that evidence which, if believed, requires
the conclusion that unlawful discrimination was at least a
motivating factor in the employer's actions." Jacklyn v.
Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926
(6th Cir. 1999).

    Coveney admits that she has no direct evidence of age
discrimination that led to her discharge, and her opposition
memorandum is focused on circumstantial evidence.  Circumstantial
evidence is evidence  ". . . that does not on its face establish
discriminatory animus, but does allow a fact finder to draw a
reasonable inference that discrimination occurred." Wexler v.
White's Fine Furniture, 317 F.3d 564, 570 (6th Cir. 2003).  An
age discrimination claim based on circumstantial evidence is
analyzed under the well-established McDonnell-Douglas framework.
To establish her prima facie case, Coveney must establish that
she is a member of a protected class, she suffered an adverse

-16-

employment action, she was qualified for her job, and she was replaced by a substantially younger person.  Defendant does not seriously dispute, and the Court finds, that Coveney has satisfied her prima facie burden.

The burden of production then shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  Nocella testified that Coveney was terminated for repeated incidents of unprofessional conduct which violated the Bank's code of ethics, specifically the August 2006 written warning and the February 2007 Ridley incident.[1]  This is the same explanation that was given to the EEOC.  (See Nocella Deposition Exhibit 35)  Such conduct on the part of a shift supervisor towards subordinates would be a legitimate reason to fire that supervisor, and satisfies Defendant's burden.

Coveney must then show that the articulated reason is mere pretext.  She can establish pretext by showing (1) the employer's reason has no factual basis; (2) the reason did not actually motivate the employer; or (3) the articulated reason is insufficient to justify the adverse action taken.  <u>Wexler v. White's Fine Furniture</u>, 317 F.3d at 576.  As the Supreme Court held in <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 148 (2000), "A plaintiff's prima facie case, combined with

---

[1] The record reflects other employee complaints about Coveney's behavior, but for purposes of summary judgment the Court has not considered them based on Nocella's testimony.

sufficient evidence to find that the employer's asserted justification is false may permit the trier of fact to conclude that the employer unlawfully discriminated."

Defendant contends that Coveney has failed to raise a genuine dispute under any of the three <u>Wexler</u> prongs.  Coveney disagrees, relying on evidence that (1) similarly-situated supervisors and managers, who were younger than Coveney, engaged in comparable conduct and were not disciplined, much less fired; and (2) evidence that Bank management had decided to fire Coveney **before** the Ridley incident in February 2007, and a comment Alvey made about hiring college-age people.

(1)  <u>Similarly-Situated Supervisors</u>.

Coveney claims that three other supervisors repeatedly engaged in unprofessional conduct, yet were not disciplined. She claims that Andrew Alvey, Andrew Lyall, and Angie Clemons were each the target of "multiple complaints by subordinate employees."  (Doc. 36, p. 13)  Defendant admits that Coveney is the only manager who has ever been fired for violating the Bank's code of ethics or for unprofessional conduct.  The code of ethics contains the following statement:

> Our goal is to treat fellow employees with
> respect, consideration and understanding.
> Our intention is to foster a climate
> conducive to a high level of performance
> through full communication at all levels.  We
> encourage the open discussion of job-related
> problems and prompt resolution of those
> problems.

-18-

(Nocella Exhibit 36, Attachment A)

For purposes of analyzing pretext, "similarly situated" does not mean "identically situated."  The **relevant** aspects of the two employees' situations must be similar.  These aspects include whether the two employees (1) shared the same supervisor, (2) were subject to the same standards, and (3) engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (internal citation omitted).  It is not necessary that the comparators share the same **immediate** supervisor, if the "ultimate decision-maker" is the same for both.  McMillan v. Castro, 405 F.3d 405, 414 (6th Cir. 2005).  Moreover, the conduct at issue need not be identical in every respect, but must be comparable in kind and severity.  For example, in Clayton v. Meijer, Inc., 281 F.3d 605, 610-611 (6th Cir. 2002), the Sixth Circuit found that plaintiff was not similarly situated to another employee who violated the same workplace safety policy, because the plaintiff's violation resulted in severe injuries to another employee.

Andrew Alvey:  Coveney complained to Nocella and Sims about Alvey's frequent use of foul language.  There is no evidence in the record that anyone else complained to management about this subject.  After verifying Coveney's complaint, Alvey was

-19-

counseled by his direct supervisor, Jim Sass.  Assuming similarity in other respects, Alvey's conduct differs substantially from the conduct with which Coveney was charged. Coveney does not allege that Alvey directed his admitted profanity at any individual, or that he used profanity to belittle or demean a subordinate employee.  Alvey received formal counseling from his supervisor, a written record of which was placed in his file.  Coveney complains that Alvey received only a "slap on the wrist" for his misconduct.  While Alvey did not receive a warning that he might be terminated, a written record of the counseling was placed in his file.  Moreover, Coveney admits that Alvey's objectionable conduct ceased after he was warned.  The conduct at issue clearly differentiates Alvey from Coveney.

Andrew Lyall:  Coveney contends there were "numerous" complaints about Lyall's unprofessional conduct towards subordinate employees.  The evidence she proffers is from two employees, Monica Kirk and Inessa Rulli.

Kirk voluntarily resigned her employment on February 11, 2007; she had previously received a written warning concerning her inappropriate handling of an affair between two employees on her shift.  Coveney submits two declarations from Monica Kirk, one signed on March 11, 2008 and the other on March 26, 2008.  In the first, Kirk states that Lyall did not "support her" and her

team as much as he did the other shift supervisors.  She states
that he unfairly gave her the written warning, and did not
believe her version of the incidents that led to it.  In her
second declaration, Kirk states that Lyall was "very
condescending and rude" and that he "typically rejected out of
hand any concerns or suggestions I had.  He often was curt with
me, would cut me off mid-sentence, and used a harsh tone.  From
my perspective, Mr. Lyall talked to me like I was a child.  I
often broke out into hives when he spoke to me like this."  Kirk
states that she verbally complained two or three times about
Lyall to both Nocella and to Alvey.  She states that she quit her
job because she "could no longer tolerate working for Mr. Lyall."
She also claims that she wrote a letter to Nocella about Lyall,
and slipped it under his door the day she quit.  Nocella denied
receiving any complaints from Kirk about Lyall, and testified
that she offered no reason for her voluntary departure other than
it was "time to move on."  (Nocella Deposition p. 108)

   Lyall was asked in his deposition about meting out
discipline to employees.  He admitted that employees had
complained to human resources that he was "too rough with them,
too brusque, that sort of thing."  (Lyall Deposition pp. 43-44)
Lyall described these complaints as "very common in management."
(Id.)  Lyall also described the incident involving Inessa Rulli,
who complained to Nocella that Lyall was "loud" on the telephone

with her while discussing her request to take vacation during the holidays (a request her manager had turned down).  Nocella talked to both of them, and found no reason to discipline Lyall.

Defendant contends that Lyall is not similarly situated to Coveney, and therefore all of this is irrelevant.  It is true that Coveney and Lyall did not share a direct supervisor.  But Alvey and Nocella were both involved in the decision concerning Coveney, and would be the decision makers concerning any discipline for Lyall.  Defendant admits that the code of ethics and conduct standards apply equally to all employees.  The only question is whether the conduct is substantially similar.

Defendant attacks Kirk's declarations as too vague and lacking in any probative value, suggesting her credibility is doubtful.  The Court does not determine questions of veracity or credibility in ruling on summary judgment motions.  Kirk's and Rulli's complaints about Lyall - rudeness, yelling, cutting Kirk off mid-sentence - are similar in substance to the complaints about Coveney that led to her termination, and therefore satisfy her burden on this issue.

<u>Angie Clemons</u>: Alvey promoted Clemons to weekend supervisor, over another internal candidate, Dori Holmes.  Coveney asserts that "numerous" employees complained about Clemons' treatment of them.  The record reflects that Holmes complained to Nocella that Clemons had called her "computer stupid."  There were no

-22-

witnesses to the conversation between Holmes and Clemons.
Nocella admitted that use of the word "stupid" to a subordinate
employee would be unprofessional conduct.  Nocella testified that
he investigated Holmes' complaint, and could not confirm that
Clemons had actually used the word "stupid."  Nocella concluded
that Holmes had misinterpreted Clemons' response to Holmes'
request for training on a specific computer function, and that
Clemons had not been unprofessional.  (Nocella Deposition pp. 82-
85)

Nocella's declaration (Doc. 23, Exhibit 1) attaches a letter
Holmes wrote to the Bank after her June 24, 2006 termination (for
failing to sign a cash receipt slip).  In that letter, Holmes
complains that Angie Clemons created a "hostile environment" on
third shift.  She claims that after Clemons was promoted to
supervisor, she stopped talking to Holmes for months "and on
several occasions yelled at me in front of employees, called me
stupid and made decisions in my area that had negative impacts on
getting the job done...".  As with Kirk's complaints about
Lyall, Holmes' letter does not provide time or place specifics of
this conduct.  The Bank contends that Holmes, like Kirk, was
simply disgruntled about losing her job.  Again, it is not this
Court's duty to determine veracity and credibility.  There is no
dispute that Coveney and Clemons were similarly situated in other
respects, as they held the same position and reported to the same

supervisor.

Thus, while the question is a close one, Coveney has come forward with evidence suggesting that she was treated differently than others who were similarly situated.

(2)  <u>Other Pretext Evidence</u>.

Kirk states in her first declaration that, at some unspecified date before she left the Bank, she complained to Lyall about "some issue" she had with Coveney.  According to Kirk, Lyall told her that he was "going through the process" to terminate Coveney, but he had to be careful because she was "older and female" and "protected."  Kirk's second declaration states that "I understood Mr. Lyall's comment to mean that the decision to fire Ms. Coveney was a done deal – in other words, management had already made up its mind at that point."  (Kirk Declaration of 3/28/08, ¶8)  Coveney argues that Lyall's comments suggest that, contrary to the Bank's claim, the Ridley incident was not the "final straw" that caused her termination.

Defendant counters that the reported comments are too ambiguous and that Kirk's "understanding" is meaningless, given that Coveney's August 2006 warning put her on notice of further discipline "up to and including termination."  Regardless of what Kirk may have understood, her contention that Lyall said he was "going through the process" fairly suggests that Lyall had decided to fire Coveney before the Ridley incident.  While the

-24-

Bank argues that the Ridley incident was not the "motivation" for Coveney's termination, it seems clear that it was the precipitating incident and was a reason for the decision.

Coveney also alleges that Alvey commented to her that he promoted Angie Clemons in lieu of an older applicant, because he was "leaning towards hiring more college students" and the younger Clemons would "be able to better relate to them." Coveney suggests this comment is also evidence of age bias. (Coveney Deposition p. 70)  This comment, made long before Coveney's written warning, is too remote and too ambiguous to raise a dispute about Alvey's discriminatory animus.

While this is a close question, the Court concludes that Coveney has sustained her burden of coming forward with sufficient evidence to suggest that the Bank's justification for her termination may be a pretext for age discrimination.  That evidence, combined with the undisputed strength of her prima facie case, suffices to overcome Defendant's motion for summary judgment.

3.  Retaliation.

Coveney also claims that her termination was in retaliation for her August 2006 complaints about Alvey's conduct and age discrimination.  The Bank disagrees, arguing she has no evidence of a causal link between the two, and in any event no evidence of pretext.

Retaliation claims based on indirect evidence are analyzed under the McDonnell-Douglas framework.  A prima facie retaliation claim requires Plaintiff to show that (1) she engaged in protected activity, (2) her employer knew about that activity, (3) her employer took an adverse employment action after that activity, and (4) there was a causal connection between the two events.  Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007). In order to establish the fourth prong, Plaintiff must "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action."  EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997) (internal quotation marks omitted).

The Bank contends there is no evidence of a causal link between Coveney's August 2006 complaints, and her February 2007 termination.  It recognizes that temporal proximity, combined with other evidence of retaliation, can be sufficient.  But the Bank argues that here, the time lag between the two events is too great, and that Coveney has no other evidence of retaliation.

In Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008), the Sixth Circuit recently addressed the quantum of evidence needed to establish a causal connection:

> Where an adverse employment action occurs
> very close in time after an employer learns
> of a protected activity, such temporal
> proximity between the events is significant
> enough to constitute evidence of a causal
> connection for the purposes of satisfying a

-26-

> prima facie case of retaliation. But where
> some time elapses between when the employer
> learns of a protected activity and the
> subsequent adverse employment action, the
> employee must couple temporal proximity with
> other evidence of retaliatory conduct to
> establish causality.

While the lapse of time in this case, approximately six months, would not suffice on its own, the evidence discussed above of dissimilar treatment and Lyall's comments to Kirk, are sufficient (even if close) to avoid summary judgment.

4.    Ohio Public Policy Claim.

Defendant's motion seeks judgment on this claim, relying on Leininger v. Pioneer National Latex, 115 Ohio St.3d 311, 875 N.E.2d 36 (2007).  There, the Ohio Supreme Court held that no Ohio common law, public policy claim for age discrimination exists, given the broad remedies provided by the Ohio statute. Coveney does not respond to this argument, and apparently has abandoned this claim.  The Court therefore grants judgment to Defendant on Count III of the complaint.

5.    Plaintiff's Motion to Strike.

Plaintiff seeks an order striking Defendant's reply memorandum or for leave to file a sur-reply.  Given the Court's conclusions concerning summary judgment, the motion for leave to file a sur-reply is moot.  Furthermore, the Court finds the reply does not improperly raise "new" arguments, but properly responds to Plaintiff's opposition memorandum.  The motion to strike is

-27-

therefore denied.

**CONCLUSION**

For all the foregoing reasons, the Court denies Defendant's motion for summary judgment (Doc. 23) on Counts I and II of the complaint, and grants summary judgment on Count III.  The motion to strike (Doc. 41) is denied.

SO ORDERED.

DATED: September 17, 2008        <u>s/Sandra S. Beckwith</u>
                                 Sandra S. Beckwith, Chief Judge
                                 United States District Court

-28-